**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:19-cr-559 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| DEEPAK RAHEJA, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

The indictment in this matter charges defendants, Deepak Raheja ("Dr. Raheja" or "Raheja"), Gregory Hayslette ("Hayslette"), Frank Mazzucco ("Mazzucco"), and Bhupinder Sawhny ("Dr. Sawhny" or "Sawhny"), with conspiracy to commit healthcare fraud and related crimes involving the promotion and marketing of the drug Nuedexta. Nuedexta is a medication developed and sold by Avanir Pharmaceuticals, Inc. ("Avanir") to treat Pseudo Bulbar Affect ("PBA"). (Doc. No. 1 (Indictment).)

Now before the Court are the following fully briefed motions:

- Mazzucco's motion for issuance of a subpoena pursuant to Fed. R. Crim. P. 17(c) (Doc. No. 146), which plaintiff United States of America (the "government") opposes (Doc. No. 149 (Opposition)), and to which Mazzucco has replied (Doc. No. 155 (Reply));

- Raheja's motion for issuance of a Rule 17(c) subpoena (Doc. No. 147), which the government opposes (Doc. No. 150 (Opposition)), and to which Raheja has replied (Doc. No. 154 (Reply)); and

- The motions of Mazzucco and Raheja for severance (Doc. No. 159 (Mazzucco Severance Motion); Doc. No. 161 (Raheja Renewed Severance Motion)). The government has filed an omnibus response in opposition to these motions (Doc. No. 163 (Opposition)).

# I.    BACKGROUND

The Court has addressed the underlying facts surrounding this criminal matter in its February 8, 2021 memorandum opinion and order; familiarity with that ruling is presumed. (*See* Doc. No. 135.) In order to provide context for the present motions, it is sufficient to note that the indictment alleges that Mazzucco and Hayslette—while employees of Avanir—caused Drs. Raheja and Sawhny to receive unlawful kickbacks as inducements and in exchange for increasing Nuedexta prescriptions. (Doc. No. 1 (Indictment) at 7[1].)

In its February 8, 2021 memorandum opinion, the Court ruled on several pretrial motions filed by Dr. Raheja. In one of those motions, Dr. Raheja sought a mandatory/and or permissive severance from Dr. Sawhny and a permissive severance from Hayslette and Mazzucco. Dr. Raheja argued that mandatory severance from Dr. Sawhny was necessary under Fed. R. Crim. P. 8 because he was alleged to have engaged in different acts than Dr. Sawhny, and that permissive severance under Fed. R. Crim. P. 14 was warranted as to all co-defendants because of the possibility of antagonistic defenses. The Court denied Dr. Raheja's request for severance.

With respect to joinder with Dr. Sawhny, the Court rejected Dr. Raheja's argument that the two doctors are alleged to have engaged in separate and unrelated actions. Rather, the Court observed that the efforts of Dr. Raheja and Dr. Sawhny "to promote and prescribe Nuedexta furthered the shared goal of the conspiracy to ensure the success of the drug, which, in turn, would ensure a future stream of benefits." (Doc. No. 135 at 11.) As for permissive severance, the Court found that Dr. Raheja failed to demonstrate that the possibility of antagonistic defenses would result in jury confusion or compelling, specific, and actual prejudice to Dr. Raheja or his co-

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic docketing system.

defendants. (*Id*. at 14.) The Court also noted that Dr. Raheja neglected to explain why limiting instructions would be unable to cure any possible prejudice from the joinder of defendants as co-conspirators in this healthcare fraud conspiracy. (*Id*.)

In the same opinion, the Court granted the government's motion to quash subpoenas *duce tecum* issued by Dr. Raheja seeking documents and communications relating to former United States Attorney ("USA") Steven Dettelbach's involvement in the criminal investigation and charging of Dr. Raheja, as well as Dettelbach's law firm's brief pre-indictment representation of Dr. Raheja. In so ruling, the Court found that the subpoenas sought information and documents that were either procurable reasonably in advance of trial by other means or not relevant and evidentiary. (*Id*. at 4–6.) The Court also determined that the requests were not drafted with the required specificity to ensure that the subpoenas would not result in a fishing expedition. (*Id*. at 6–8.) Finally, the Court observed that one of the two subpoenas suffered from numerous technical problems—"chief of which [were] that the subpoena [was] not tied to a court proceeding and it direct[ed] the documents to be produced directly to defense counsel and away from the courthouse." (*Id*. at 8.)

On September 9, 2021, the Court conducted a telephonic status conference to discuss the portion of the pending severance motions that alternatively sought a continuance of the trial due to health concerns relating to the COVID-19 pandemic. After discussing the matter with counsel, and in light of the then-surge in Ohio of COVID-19 cases involving the Delta variant of the coronavirus, the Court agreed to continue the trial until April 20, 2022. (Minute Order, 9/9/2021.) The following day (September 10, 2021), the Court conducted a video conference with counsel and defendants to discuss an ends of justice order and to establish new dates and deadlines to govern the case. (Minutes of Proceedings, 9/10/2021; Doc. No. 166 (Fourth Amended Trial Order);

Doc. No. 167 (Ends of Justice Order).)

## II.    RAHEJA'S MOTION FOR A RULE 17(C) SUBPOENA

In his motion for issuance of a Rule 17(c) subpoena to Avanir, Dr. Raheja seeks five categories of documents and/or communications that were created, sent, or received between November 1, 2011 and March 31, 2016. (Doc. No. 147-2 (Exhibit A to Subpoena); *see* Doc. No. 147-2 (Subpoena).) The proposed subpoena directs Avanir to make its production to the courthouse on June 30, 2021.[2] The government opposes the motion on the grounds that the categories are too broad and seek documents and/or communications that are neither relevant nor admissible at trial, and that certain requested documents or communications have already been produced in discovery.

According to the government, immediately after the indictment issued in September 2019, it began to produce documents and data pursuant to Fed. R. Crim. P. 16, and it insists that its production to date has well exceeded its discovery obligations. Specifically, between November 4, 2019 and February 12, 2020, the government produced over 350,000 bates-stamped pages of documents and hard drives, and that the bates-stamped pages included files/documents obtained from Avanir that the government believed were most relevant to the case. (Doc. No. 150 at 1–2.) "In addition to the documents the government obtained from Avanir and produced as most relevant to its case, [on December 30, 2019], the government also produced a complete database containing over six million pages of documents obtained from Avanir and third-parties by the Northern District of Georgia (NDGA) through administrative subpoenas." (*Id.* at 2.) Referred to as the "load

---

[2] It is perplexing that this date was one day *after* the motion was filed. The Court assumes that the error is typographical in nature, and that, having previously been instructed by the Court to tie production to a court hearing or event, Dr. Raheja intended that the documents would be produced in connection with a hearing or other scheduled proceeding in this case.

file," the database containing these documents was word-searchable and was accompanied by a list of 51 records custodians that Avanir searched in response to the government's subpoena, as well as an eight page list of search terms Avanir used. (*Id*.) [3]

### A.    Governing Law

Rule 17(c) permits subpoenas *duces tecum* returnable prior to trial under particularized circumstances. *United States v. Nixon*, 418 U.S. 683, 698–99, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974). In *Nixon*, the Supreme Court required parties moving for a pretrial subpoena *duces tecum* in a criminal matter to show: "(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the parties cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'" *Id*. at 699–700 (footnote omitted). The Supreme Court further required a showing of relevancy, admissibility, and specificity before issuance of a pretrial subpoena *duces tecum*. *Id*. at 700. The Supreme Court in *Nixon* stressed two fundamental characteristics of Rule 17(c) subpoenas: "(1) [they are] not intended to provide a means of discovery for criminal cases; (2) [their] chief innovation was to expedite trial by providing a time and a place before trial for the inspection of subpoenaed materials." *Id*. at 698–99 (internal citations omitted). Having laid down the standard,

---

[3] During the January 16, 2020 video status conference, the Court instructed the government to provide defense counsel with a "road map" to assist in navigating the voluminous discovery that had been produced to date. The Court also asked defense counsel to provide the government with a list of priority Avanir custodians so that the government could focus on the most relevant custodial files. (Minute Order, 1/16/2020.) On February 12, 2020, the government collected and provided to defense counsel the production letters that Avanir's counsel sent along with each production describing generally what was included in the production. This collection included a chart that summarized Avanir's production of employee cell phone productions. (*Id*. at 3.)

the Supreme Court also noted that pretrial issuance of subpoenas *duces tecum* is "necessarily []  committed to the sound discretion of the trial court." *Id*. at 702. The decision to enforce or quash  a subpoena will be disturbed on appeal only when the action was clearly arbitrary or without  support in the record. *United States v. Vassar*, 346 F. App'x 17, 24 (6th Cir. 2009) (citing *United  States v. Hughes*, 895 F.2d 1135, 1145 (6th Cir. 1990)).

Additionally, Rule 17(c) subpoenas must meet certain technical requirements. In *United  States v. Llanez-Garcia*, 735 F.3d 483, 500 (6th Cir. 2013), the Sixth Circuit instructed district  courts to interpret for themselves the contours of Rule 17(c) and determine, on a court by court  basis, how they will administer and/or oversee the exercise of the Court's subpoena power.  Following the decision in *Llanez-Garcia*, this Court addressed the mechanics of Rule 17(c) on  numerous occasions. For example, in *United States v. Jeremy Mack*, Case No. 1:13-cr-278, Doc.  No. 26 (Order), the Court determined that the language of the rule supported the conclusion that  Rule 17(c) requires the requested documents to be produced in court in connection with a formal  hearing, and, therefore, a subpoena that provided for document production away from the court—  such as the defense attorney's office—and/or at a date and time far removed from any formal  hearing in the case abused the court's subpoena powers. (*Id*. at 12.)

## B. Discussion

The Court turns to the categories of documents and/or communications identified in Dr. Raheja's proposed subpoena. Request 1 seeks from Avanir all documents concerning Dr. Raheja. (Doc. No. 147-2 (Exhibit A to Subpoena) at 4.)[4] Noting that Dr. Raheja's name was a stand-alone search term employed by Avanir when it responded to the government's request for documents, the government insists that Dr. Raheja already has all documents and correspondence that are covered in this first request. (Doc. No. 150 at 8.) Dr. Raheja disagrees, noting that the use of his name would likely lead to an incomplete search given that Dr. Raheja's co-defendant's often referred to him as "Dr. R" or "DR". (Doc. No. 154 at 5.) While this might be true for text messages and other informal methods of communications, Dr. Raheja has failed to come forward with any evidence that more formal documents, such as receipts, payments, and the like, used such an incomplete and vague reference to Dr. Raheja's name. As to texts and emails, the government asserts that Dr. Raheja has all of the emails and text messages that it received from Avanir that reference Dr. Raheja. Dr. Raheja does not dispute the government's representation. Instead, he underscores the fact that the government "does not assert that Dr. Raheja possesses *all* of the relevant emails and text messages." (Doc. No. 154 at 7, emphasis in original.) He suggests that "[t]he only way to confirm that the requested documents have been produced in full is to allow Avanir to review the Subpoena and respond accordingly." (*Id*. at 4.)

---

[4] Specifically, Request No. 1 seeks:

> Any and all documents and/or communications that were prepared, sent, received, obtained, or internally exchanged referencing, pertaining to, or from Dr. Deepak Raheja. Said request includes, but is not limited to, any documents or correspondence(s) that were prepared by, sent to, and/or received via text message, email, instant message, WhatsApp, KIK Messenger application, and any other form of electronic communications wherein Dr. Raheja is mentioned by name or by reference.

(Doc. No. 147-2 at 4.)

The parties advance similar arguments with respect to Requests 2 and 3, which essentially seek all documents concerning Avanir's speaker bureau program and other marketing for Nuedexta.[5] The government identifies approximately 20 search terms involving variations on the word "speak" that Avanir used in locating communications and documents associated with the speaker bureau program. This strategy, the government notes, netted nearly 15,000 documents totaling more than one million pages in the load file. (Doc. No. 150 at 9–10.) Dr. Raheja, again, questions the completeness of the production. He argues that "[w]hile some of the documents produced because of these keyword searches may be contained within the load file, the only way to know is to serve the subpoena upon Avanir and let Avanir formally respond." (Doc. No. 154 at 6.)

Instead of identifying specific, relevant, and admissible evidence that was omitted from the government's production, Dr. Raheja's position is essentially that he should be permitted to propound open-ended, wide reaching discovery requests, so that he can either expand upon or test the completeness of the government's production. Dr. Raheja fails to identify any authority that

---

[5] Request 2 seeks:

> Any and all documents and/or communications that were prepared, sent, received, obtained or internally exchanged concerning or pertaining to the speaker bureau and/or speaking events, including but not limited to the attendance of guests; the oversight of food and beverages; and the oversight over the AV equipment.

Request 3 seeks:

> Any and all documents and/or communications that were prepared, sent, received, obtained, or internally exchanged pertaining to Nuedexta as follows:
>
> a.  Payments to doctors for Nuedexta sales and their annual volume of sales, whether or not they participated in Avanir's speaking bureau and/or speaking events;
>
> b.  Speaking engagements by all doctors and payments associated therewith;
>
> c.  Avanir's marketing, including any advertising, training scripts, training films, speaker's scripts, slide shows, and/or training material provided to pharmaceutical representatives or speaking doctors.

(Doc. No. 147-2 at 4–5.)

permits him to embark on what is clearly a fishing expedition designed solely to confirm what he has already received in discovery and/or possibly discover additional documents that may or may not exist. But as the Court has already observed, "Rule 17(c) was not intended to provide additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220, 71 S. Ct. 675, 95 L. Ed. 879 (1951) ("It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms.") As such, it is "only a mechanism for obtaining specific admissible evidence" ahead of trial. *United States v. Donziger*, No. 18-cr-561, 2021 WL 1865376, at *4 (S.D.N.Y. May 10, 2021). Because the first three broadly worded requests are impermissible discovery requests which encompass the vast trove of documents already produced by the government, Dr. Raheja will not be permitted to utilize the Court's subpoena power to seek them. *See, e.g., United States v. Turner*, No. 4:19-cr-26, 2021 WL 2806219, at *3 (W.D. Ky. July 6, 2021) (denying, on motion for reconsideration, motion to issue Rule 17(c) subpoena to third-parties seeking all emails and documents associated with government's criminal investigation as impermissible discovery request); *United States v. Minton*, No. 5:17-cr-6, 2017 WL 1078635, at *5 (E.D. Ky. Mar. 21, 2017) (quashing "broadly worded" Rule 17(c) subpoenas issued to private individuals and company); *see also United States v. Cooper*, No. 08-20464, 2009 WL 1384145, at *7 (E.D. Mich. May 14, 2009) (noting that a subpoena request based on a belief that more documents may exist amounts to an impermissible discovery request); *United States v. Skeddle*, 178 F.R.D. 167, 170 (N.D. Ohio 1996).

Request 4 seeks the complete personnel files of Hayslette and Mazzucco.[6] The government insists that it has already produced these files, noting that Hayslette and Mazzucco "were also custodians searched by Avanir and whose personnel files are in the discovery produced in this case—indeed, the government disclosed these files as part of its bates-stamped hot document production[7] and then again in the load file." (Doc. No. 150 at 8–9.) Dr. Raheja takes issue with the government's representation, noting that a keyword search in the file for "Mazzucco" turns up over 23,000 documents "randomly spread throughout the entire load file[.]" (Doc. No. 154 at 5.) For example, Dr. Raheja complains that Mazzucco's resume and 2014 performance review were separated by thousands of documents. (*Id*.) He suggests that "the argument that Dr. Raheja has been provided Mazzucco's complete personnel file is illogical considering the organization, order, and presentation of the files." (*Id*. at 6.)

But the Sixth Circuit has held that Rule 16 does not require that discovery be indexed or organized in a specific way. *United States v. Warshak*, 631 F.3d 266, 296 (6th Cir. 2010). Dr. Raheja does not identify any relevant and admissible documents from these personnel files that were not included in the government's production. Accordingly, he has failed to demonstrate the government's production was deficient, or that it does not contain what the government has represented it contains. Further, the Court is unaware of any authority (and Dr. Raheja has cited

---

[6] Specifically, Request 4 seeks:

> Any and all personnel files of Gregory Hayslette and Frank Mazz[u]cco. Said request includes, but is not limited to, any documents and/or communications that were prepared, sent, received, obtained, or internally exchanged referencing Gregory Hayslette and/or Frank Mazz[u]cco and Dr. Raheja.

(Doc. No. 147-2 at 5.)

[7] Dr. Raheja insist that his counsel never received the hot document production. (Doc. No. 154 at 5 n.1.) The government is directed to either produce these documents to Dr. Raheja's counsel immediately or confirm that the documents were previously produced and advise counsel as to when the production was made and where the documents can be located in its discovery.

none) that would support the proposition that a defendant may utilize Rule 17(c) to obtain previously produced discovery in a different format or organizational scheme. *Cf. Nixon*, 418 U.S. at 698–99 (Rule 17(c) cannot be used to expand the scope of discovery beyond the government's limited obligations); *Bowman*, 341 U.S. at 220 (similar). Documents and communications responsive to Request 4 may not be sought through a Rule 17(c) subpoena. All this said, the government is directed to contact Avanir to determine whether stand-alone personnel files exist for Hayslette and Mazzucco and so advise the Court by no later than January 28, 2022.

Request 5 seeks all documents and communications relating to executives 1–4 and employees 1–9 identified in the indictment.[8] The government objects to this request on the grounds that it is overly broad, and that—with the exception of documents or communications relating to Dr. Raheja, which were included in the load file— it fails to establish that the requested documents are relevant. The Court agrees that this "excessively broad" and "overly vague" request is not permitted under Rule 17(c). *United States v. Richardson*, 607 F.3d 357, 368 (4th Cir. 2010); *see also United States v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002).

It is clear from Dr. Raheja's motion, that, at the time he filed the motion, he and his new counsel had yet to fully digest all of the discovery that was provided by the government. While this is understandable given the voluminous nature of discovery, the remedy would be a request

---

[8] Request 5 seeks:

> Any and all documents and/or communications that were prepared, sent, received or obtained referencing or pertaining to executives one through four (1–4) and employees one through nine (1-9), as set forth in paragraphs six through nineteen (6–19) of the Statement of Facts, attached as Exhibit A to Avanir's Deferred Prosecution Agreement with the United States. Said request includes, but is not limited to, any documents or correspondence(s) that provide the personnel files and address of each individual's sales associated with Nuedexta and/or Dr. Raheja.

(Doc. No. 147-2 at 5.)

for a continuance, not a far-reaching Rule 17(c) subpoena seeking duplicative or irrelevant documents. *See United States v. Richards*, 659 F.3d 527, 544–45 (6th Cir. 2011) (citing *United States v. Jordan*, 316 F.3d 1215, 1253 (11th Cir. 2003) (rejecting defendant's claim that voluminous discovery necessitated that the government identify the documents it intended to rely upon at trial, and noting that a continuance is the remedy if additional time is needed to sort through large discovery productions)). Given that the Court continued this matter until April 2022, Dr. Raheja's current counsel should have now had ample time in which to review the government's document productions, and the Court trusts that if more time is needed counsel will request it.

It is evident that Dr. Raheja filed the subpoena request before he and his counsel had sufficient time to review the vast amount of discovery provided by the government. With his new counsel now having had several months to review the discovery, Dr. Raheja may now be satisfied that he has received all documents to which he is entitled. Going forward, should Dr. Raheja identify specific, relevant documents and/or other narrowly circumscribed categories of information that have not previously been produced in discovery and is otherwise able to satisfy the requirements in *Nixon*, he may pursue any such Rule 17(c) subpoena. For now, however, and for all of the foregoing reasons, Dr. Raheja's motion for a Rule 17(c) subpoena is denied.

### III.    MAZZUCCO'S MOTION FOR A RULE 17(C) SUBPOENA

Mazzucco also seeks permission to serve a Rule 17(c) subpoena on Avanir. Exhibit A to his proposed subpoena identifies 11 categories of documents, communications, and forensic images to be produced. (Doc. No. 146 at 8–9.) The subpoena further provides that the production is to take place at defense counsel's office "30 days from issuance." (*Id*. at 4.) The government objects to the issuance of the subpoena, arguing that Mazzucco's motion should be "summarily

den[ied]" because Mazzucco "failed to attempt to meet his burden of showing that his proposed subpoena complies with Criminal Rule 17(c) and [*Nixon*]." (Doc. No. 149 at 1.) Additionally, the government maintains that the subpoena's requests are overly broad and seek information that is irrelevant, inadmissible, or already in Mazzucco's possession. (*Id*.)

As an initial matter, the Court agrees that the subpoena fails to meet the technical pleading requirements of Rule 17(c). In its prior ruling granting the government's motion to quash the subpoenas in Dr. Raheja's first Rule 17(c) motion, the Court advised all counsel that it had "interpreted Rule 17(c)'s procedural mechanisms on numerous occasions. *See, e.g., United States v. Farmer*, No. 1:14-cr-362, 2015 WL 1471965, at *2–4 (N.D. Ohio Mar. 31, 2015). Rather than repeat the substance of those opinions here, *the Court instructs **all** counsel to familiarize themselves with these rulings prior to issuing future Rule 17(c) subpoenas*." (Doc. No. 135 at 9, emphasis added.) Had counsel heeded the Court's admonition, it would have discovered that the Court, in accordance with the plain language of Rule 17(c), requires Rule 17(c) subpoenas to demand production of the requested materials at the courthouse and at a time that "bear[s] some relation to a scheduled hearing or the trial." *Farmer*, 2015 WL 1471965, at *3. Here, Mazzucco does not meet either requirement. The proposed subpoena requests production at defense counsel's office—away from the courthouse—and within 30 days if the issuance of the subpoena. Even before the Court continued this matter to Spring 2022, the timing set forth in the subpoena bore no relation to a scheduled hearing or trial in this matter.

Given that the technical deficiencies in the proposed subpoena alone require denial of Mazzucco's motion, there is no need to devote additional judicial resources to reviewing each category of documents and information sought by the subpoena. Nevertheless, the Court believes it prudent to make a general observation about the scope of the requests as they relate to Rule 17(c)

13

and the standard set forth in *Nixon, supra*.

The categories of requested documents and information listed in Exhibit A to the proposed subpoena are extremely broad and do not appear narrowly tailored to obtain relevant and admissible evidence that is not otherwise procurable from other sources. For example, Request 3 seeks "[a] full and complete forensic image of the cell phone records previously produced by Avanir to the Government . . . ."[9] (Doc. No. 146 at 8.) In response to the government's objection that these records are contained in the load file, Mazzucco explains in his reply[10] that "[t]he requested metadata and supporting information related to these text messages that was not produced by the government is either directly admissible evidence by itself, or will aid in uncovering admissible evidence (such as additional phone logs, metadata, or records) or assist in witness preparation regarding the contents, context, timing, and meaning of the allegedly incriminating messages, and will assist in impeaching and rebutting witness testimony regarding the meaning of the text messages in question."[11] (Doc. No. 155 at 10.)

There are several problems with Mazzucco's explanation. First, Rule 17(c) is not properly utilized to seek information for impeachment purposes. *Nixon*, 418 U.S. at 701 ("Generally, the

---

[9] Indeed, the language used to describe this category makes clear that this information was previously produced by the government.

[10] The only attempt Mazzucco makes to demonstrate that his proposed subpoena meets the *Nixon* standard appears in the reply, filed after the government was forced to guess or speculate as to the possible use of the requested information. (*See, e.g.*, Doc. No. 149 at 10 ["Since Mazzucco offers no explanation for his requests, we are left to guess that Mazzucco intends to use [the requested separation agreements] to impeach any such employee testifying on the government's behalf, which is an impermissible purpose for Rule 17(c) subpoenas."].) Arguments raised for the first time in a reply brief are waived. *See Sanborn v Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held, however, that arguments raised for the first time in a reply brief are waived."); *Hunt v. Big Lots Stores, Inc*., 244 F.R.D. 394, 397 (N.D. Ohio 2007) (similar). Given that Mazzucco bore the burden of demonstrating his entitlement to the Rule 17(c) subpoena, his arguments in support of its issuance should not have been reserved for his reply.

[11] Indeed, Mazzucco represents that all of the documents requested through Rule 17(c) "are important to uncovering admissible evidence, aiding witness preparation, corroborating testimony, and assisting impeachment or rebuttal related to Mr. Mazzucco's understanding as to the lawfulness of the kickbacks[.]" (Doc. No. 155 at 4 n.3.)

need for evidence to impeach witnesses is insufficient to require its production in advance of trial.") Further, it is not sufficient that the documents and information requested may lead to the discovery of admissible evidence. *See United States v. Cherry*, 876 F. Supp. 547, 553 (S.D.N.Y. 1995) ("In this respect, Rule 17(c) can be contrasted with the civil rules which permit the issuance of subpoenas to seek production of documents or other materials which, although not themselves admissible, could lead to admissible evidence.")[12]

Mazzucco remains free to seek a subpoena *duces tecum* that satisfies the *Nixon* standard as well as the technical requirements of Rule 17(c). His present motion fails to do so and is denied.

## IV.   MOTIONS TO SEVER

Both Mazzucco and Dr. Raheja also seek permissive severance on the following grounds: (1) the existence of antagonistic defenses; and (2) the ongoing public health emergency relating to the COVID-19 pandemic. Additionally, Mazzucco claims that he was improperly joined with his co-defendants and entitled to a mandatory severance under Rule 8(b). The government insists that defendants, as co-conspirators, were properly joined, the risk of antagonistic defenses does not warrant severance, and the safety and health measures implement in the Northern District of Ohio will sufficiently protect all participants and spectators from risks associated with COVID-19. Given the considerable overlap in the arguments raised by Mazzucco and Dr. Raheja in support of severance, the Court will, where appropriate, discuss the motions together.

---

[12] Other enumerated requests demonstrate the overly broad nature of the document categories. Request 9, for example, seeks "Avanir Organizational Charts from 2001 through 2016 for Avanir's Sales, Compliance, and Legal Departments." (Doc. No. 146 at 9.) The government opposed this request on the ground that the organizational charts were the first documents produced by Avanir and turned over to the defense by the government. (Doc. No. 149 at 9.) Mazzucco agreed that the government had turned over organizational charts for sales personnel but noted that he was also requesting organizational charts for the "Compliance" and "Legal Departments." (Doc. No. 155 at 6.) To the extent that these charts are admissible and relevant, Mazzucco's document request should have been limited to the documents not otherwise procurable from another source--here, the government's prior discovery production.

## A.  Public Health Concerns Associated with COVID-19

Both Mazzucco and Dr. Raheja maintain that the current health crisis surrounding the COVID-19 pandemic, and in particular the emergence of the Delta (and now, presumably, Omicron) variant of the coronavirus, necessitates severance of defendants. Dr. Raheja argues that severing his case from Hayslette and Mazzucco will shorten the length of the trial and reduce the number of participants in each proceeding. (Doc. No. 161 at 7–8.) Mazzucco underscores the fact that "[s]everal individuals essential to the proceeding including counsel for Dr. Raheja and Mr. Mazzucco, are immunocompromised. The longer the trial proceeds and the more witnesses that are presented, the greater the chance the proceedings will be hampered or delayed due to illness[.]" (Doc. No. 159 at 8.) He posits that any convenience and economies typically gained by trying co-conspirators together would be lost in the midst of this public health emergency. (*Id*.)

To the extent the severance motions rely on the COVID-19 pandemic, the Court finds that it already accounted for concerns associated with the pandemic when it continued the case until Spring 2022 when the Centers for Disease Control and Prevention ("CDC") predicts COVID-19 (and the Delta and Omicron variants) is likely to become a diminishing health risk in the United States.[13]

Still, the Court recognizes that health officials do not possess a crystal ball and that no one is able to predict with certainty what the future of COVID-19 will be. Accordingly, as the newly

---

[13]  https://www.city-journal.org/good-news-from-cdc-on-delta-variant-covid-pandemic?wallit_nosession=1 (posted 9/10/2021); https://www.news5cleveland.com/news/continuing-coverage/coronavirus ("If you look across the country, it is quite clear Delta has begun to move into a declining phase.") (last visited 1/13/2022); https://fox8.com/news/omicron-in-ohio-where-we-stand-after-first-cases-were-detected-5-weeks-ago/ (quoting Dr. Andy Thomas, Chief Clinical Officer at the Ohio State University Wexner Medical Center, who opined that the Omicron variant is likely to peak in Ohio in January 2022) (posted 1/12/2022); https://www.wksu.org/health-science/2022-01-05/omicron-peak-could-make-january-a-bad-month-for-covid-19-in-northeast-ohio (predicting that the Omicron variant is currently peaking in Ohio and will likely provide greater immunity to the general population for future variants) (posted 1/5/2022.

established trial date draws near, the Court will closely monitor the situation and reassess as necessary the risks of going forward. The Court also anticipates that, as it has done with other trials during the pandemic, it will employ certain safety measures designed to ensure that all participants and the public remain safe. (*See* Amended General Order 2020-08-10 (1/6/2022)). These measures include plexiglass partitions, masking, and reconfiguration of the courtroom so as to provide for social distancing where possible. While exposure risks cannot be eliminated, the Court believes that this mitigation strategy will allow the trial to be conducted in a safe and prudent manner.

### B. Timeliness of the Motions

To the extent that the severance motions are based on concerns relating to Rule 8 and Rule 14, the Court finds that the motions are untimely. Even before the Court granted the most recent extensions—the complexity of the case, the number of defendants, the voluminous nature of discovery, and the COVID-19 pandemic—necessitated several adjustments to the Court's trial schedule. On November 6, 2019, the Court amended the original trial order to provide for, among other things, the filing of pretrial motions by April 3, 2020. (Doc. No. 54 (Amended Trial Order); *see* Doc. No. 25 (Trial Order).) In a non-document order dated April 3, 2020, the Court granted defendants' joint motion to continue all dates related to pretrial motions. (*See* Doc. No. 78 (Joint Motion).) As per the Court's order, the new date for filing pretrial motions was June 5, 2020, with a motion hearing scheduled for June 24, 2020. (Non-document Order, 4/3/2020.) When defendants failed to file any pretrial motions by the new deadline, the Court canceled the pretrial motions hearing. (*See* Non-document Order, 6/23/2020.)

Dr. Raheja subsequently sought leave to replace his counsel. After a video status hearing, the Court granted permission for new counsel to enter an appearance and extended the time for Dr. Raheja alone to file pretrial motions to October 2, 2020. (Minute Order, 6/30/2020.) The Second

17

Amended Trial Order issued shortly after the hearing provided that the pretrial motion deadline for Dr. Raheja's co-defendants had passed. (*See* Doc. No. 101.) On October 19, 2020, the Court granted, in part, Dr. Raheja's motion to extend deadlines, and provided, relevant to the present motion, that his pretrial motions were due December 4, 2020. (Non-document Order, 10/19/2020.) Dr. Raheja timely filed his first motion for relief from prejudicial joinder on December 4, 2020. (*See* Doc. No. 118.) The Court denied the motion on February 8, 2021. (*See* Doc. No. 135.)

Dr. Raheja's second motion for severance, styled "Renewed Motion for Relief from Prejudicial Joinder," was filed on September 3, 2021. There is no provision in the Federal Criminal Rules for "renewed" motions. While common law recognizes motions for reconsideration, such motions are subject to the same standards applicable to a civil motion to alter or amend judgment under Rule 59 of the Federal Rules of Civil Procedure. *See, e.g., United States v. Holtzhauer*, No. 2:05-cr-170, 2006 WL 1582444, at *1–2 (S.D. Ohio June 8, 2006). Under Rule 59(e), "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). Dr. Raheja's "renewed" motion was filed almost 7 months after the Court's ruling on his initial motion.[14] His present severance motion is, therefore, untimely. Mazzucco was even tardier in filing his severance motion, as the motion was filed exactly 17 months after his deadline. Because the motions are untimely, they are subject to denial for this reason alone.

---

[14] Additionally, under the Rule 59 standard, a court may grant a motion for reconsideration for one of three reasons: because of an intervening change in controlling law, because evidence not previously available has become available, or because it is necessary to correct a clear error of law or prevent manifest injustice. *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 1999). Dr. Raheja has failed to advance any arguments that arguably fit into one of the permissible reasons for seeking reconsideration. For this additional reason, his motion is denied.

## C.  Merits

### 1.  Law Governing Severance

Nevertheless, even if the Court reached the merits of the untimely severance motions, they would be denied. Rule 8(b) permits "joinder in an indictment of defendants 'alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.'" *United States v. Swift*, 809 F.2d 320, 322 (6th Cir. 1987) (quoting Fed. R. Crim. P. 8(b)). This rule is to be "broadly construed in favor of initial joinder[.]" *Id.* (quotation marks and citation omitted). "A group of acts or transactions is logically interrelated, for instance, if the acts or transactions are part of a common scheme or plan." *United States v. Johnson*, 763 F.2d 773, 776 (6th Cir. 1985). When defendants are joined for participating in the same series of actions, such as in a conspiracy, the defendants may be charged in one or more counts and all defendants need not be charged in each count. *See United States v. Warner*, 690 F.2d 545, 551 (6th Cir. 1982) ("It is well settled that joinder is proper under Rule 8(b) where an indictment charges multiple defendants with participation in a single conspiracy") (quotation marks and citation omitted). "The predominate consideration is whether joinder would serve the goals of trial economy and convenience; the primary purpose of this kind of joinder is to insure that a given transaction need only be proved once." *Swift*, 809 F.2d at 322 (quotation marks and citation omitted). But where defendants are improperly joined, severance is mandatory. *United States v. Hatcher,* 680 F.2d 438, 441 (6th Cir. 1982).

But even where defendants have been properly joined, a district court may still choose to sever one or more defendants, or one or more counts, if joinder "appears to prejudice a defendant or the government ...." Fed. R. Crim. P. 14(a). A decision to grant or deny a motion to sever under Rule 14(a) is left to the discretion of the trial court. *See United States v. Lopez,* 309 F.3d 966, 971

(6th Cir. 2002); *United States v. Anderson,* 89 F.3d 1306, 1312 (6th Cir. 1996). "In order to prevail on a motion for [permissive] severance, a defendant must show compelling, specific, and actual prejudice from a court's refusal to grant the motion to sever." *United States v. Saadey,* 393 F.3d 669, 678 (6th Cir. 2005) (citing *United States v. Sherlin,* 67 F.3d 1208, 1215 (6th Cir. 1995)). "As a general rule, persons jointly indicted should be tried together because 'there is almost always common evidence against the joined defendants that allows for the economy of a single trial.'" *Lopez,* 309 F.3d at 971 (quoting *United States v. Phibbs,* 999 F.2d 1053, 1067 (6th Cir. 1993)).

### 2. *Mandatory Severance*

As an initial matter, the Court can make short work of Mazzucco's mandatory severance argument. According to Mazzucco, mandatory severance is necessary under Rule 8(b) in that he is improperly joined with his co-defendants because "there are seven (7) different sets of charges totaling forty (40) counts that do not include Mr. Mazzucco." (Doc. No. 159 at 6.) He suggests, "[i]n this respect, the Indictment is similar to *Kotteakos v. United States*, 325 U.S. 750[, 66 S. Ct. 1239, 90 L. Ed. 2d 1557] (1946), which held that joinder was improper where separate conspiracies that did not involve the same Defendants were present. " (*Id*.) The Court has already rejected a virtually identical argument when it denied Dr. Raheja's first motion to sever. In so ruling, the Court specifically distinguished *Kotteakos*, a case involving individual defendants who obtained separate fraudulent loans through a common lender, leading the Supreme Court to find that the defendant loan recipients were simply "separate spokes meeting at a common center[.]" *Kotteakos*, 325 U.S. at 755. In rejecting the comparison to *Kotteakos*, this Court found that "[u]nlike individual spokes operating separately and without touching the other spokes, the indictment herein alleges that the co-defendant[s] were working together toward a common goal with the paths of the individual co-conspirators continuously intersecting." (Doc. No. 135 at 12.) Mazzucco

20

has failed to convince the Court that its prior determination that he and his co-conspirators were properly joined in one over-arching conspiracy designed to benefit themselves and their co-defendants through unlawful kickbacks was erroneous. The fact that he may not be charged in every count does not change the result. *See Warner*, 690 F.2d at 551. Mazzucco is not entitled to mandatory severance under Rule 8(b).

### 3. *Permissive Severance*

Both Mazzucco and Dr. Raheja argue that they will be impermissibly prejudiced by the presentation of antagonistic defenses at trial. Mazzucco notes "[t]here is no longer a mere possibility that Dr. Raheja and Dr. Sawhny may present antagonistic defenses against Mr. Mazzucco, it is a certainty. Counsel is aware that Co-Defendants intent to call witnesses, lay and expert, to try and demonstrate Mr. Mazzucco manipulated, groomed, and pressured Dr. Raheja into marketing and prescribing Nuedexta." (Doc. No. 159 at 7, citing Doc. No. 118 at 13 ("Dr. Raheja[] will be pointing the finger at both [Mr. Mazzucco and Hayslette.")].) Dr. Raheja agrees, and further notes that he "anticipates that Hayslette and Mazzucco intend to argue that their conduct was the result of pressure that they received from Dr. Raheja." (Doc. No. 161 at 6.)[15]

"Antagonistic defenses arise when one person's claim of innocence is predicated solely on the guilt of a co-defendant." *United States v. Harris*, 9 F.3d 493, 501 (6th Cir. 1993). The standard for severing based on antagonistic defenses is "very high[.]" *United States v. Norwood*, 50 F. Supp. 3d 810, 827 (E.D. Mich. 2014). As the district court in *Norwood* observed:

---

[15] According to Dr. Raheja, "Hayslette and Mazzucco will attempt to paint a picture that Dr. Raheja was hired to give presentations for Avanir, but soon began demanding additional speaker engagements for the purpose of receiving more compensation. . . . Thus, Hayslette and Mazzucco will effectively contend that they succumbed to Dr. Raheja's pressure in an effort to protect their own livelihoods." (*Id*. at 6–7.)

> Hostility among defendants or the attempt of one defendant to save himself by inculpating another does not require that defendants be tried separately. Neither does a difference in trial strategies mandate separate trials. The burden is on defendants to show that an antagonistic defense would present a conflict so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.

*Norwood*, 50 F. Supp. 3d at 827 (quoting *Warner*, 971 F.2d at 1196). "In other words, 'mutually antagonistic defenses are not prejudicial *per se*,' and Fed. R. Crim. P. 14 does not require severance even if some prejudice is shown." *Id.* (quoting *United States v. Carpenter*, No. 12-20218, 2014 WL 943094, at *2 (E.D. Mich. Mar. 11, 2014) (further quotation marks and citation omitted)); *see Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993). "The 'mere fact that each defendant points the finger at his co-defendant is insufficient.'" *United States v. Fields*, 763 F.3d 443, 457 (6th Cir. 2014) (quoting *Warner*, 971 F.2d at 1196); *see United States v. Dhaliwal*, 464 F. App'x 498, 510 (6th Cir. 2012) ("[T]he attempt of one defendant to save himself by inculpating another defendant does not require that the defendants be tried separately.") Instead, a defendant must show that the evidence at trial would be so confusing that "a jury could [not] reasonably be expected to sort out the evidence." *United States v. Crotinger*, 928 F.2d 203, 206 (6th Cir. 1991).

Dr. Raheja and Mazzucco fail to demonstrate how their arguably antagonistic defenses might confuse or mislead the jury, as required to obtain a severance. There is simply no reason to believe that a jury would be unable to sort out the evidence applicable to whether Mazzucco and Hayslette were grooming an unsuspecting Dr. Raheja, or whether Dr. Raheja was the driving force behind the kickbacks. *See, e.g., Crotinger*, 928 F.2d at 206 (finding that "a jury could reasonably be expected to sort out the evidence applicable to whether [the passenger], [the driver], or someone else owned the suitcases containing the marijuana").

These defendants also fail to even suggest, let alone show, that "less drastic measures, such as limiting instructions," will fail to cure any potential risk of prejudice. *See Zafiro*, 506 U.S. at 539–40 (holding that instructions from district court regarding government's burden of proof as to each defendant and the importance of each defendant having his or her case determined individually "suffic[ed] to cure any possibility of prejudice" from antagonistic defenses); *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) ("Even where the risk of prejudice is high," limiting instructions can cure the risk) (quotation marks and citation omitted); *see also United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002) ("Juries are presumed to be capable of following instructions . . . regarding the sorting of evidence and the separate consideration of multiple defendants.").

Having previously determined that "the obvious conveniences and economies to be gained from trying this complex conspiracy in one proceeding, and the lack of any reason to believe that a curative instruction will not be sufficient to protect against any spillover prejudice," favor one joint trial, the Court finds that the present severance motions do not counsel in favor of a different conclusion. (*See* Doc. No. 135 at 14.) *See, e.g., United States v. Fernandez*, 559 F.3d 303, 317 (5th Cir. 2009) (limiting instruction that each charge against each defendant was to be considered separately was sufficient to cure any possible prejudice from joint trial). Accordingly, severance of defendants is neither necessary nor advisable.

## V.     CONCLUSION

For the foregoing reasons, the motions of Mazzucco and Dr. Raheja to issue Rule 17(c) subpoenas and for severance (Doc. Nos. 146, 147, 159, 161) are denied. Further, the government is directed to advise the Court by January 28, 2022 as to the results of its discussion with Avanir regarding the existence of any stand-alone personnel files of Hayslette and Mazzucco.

**IT IS SO ORDERED**.

Dated: January 14, 2022

_____
**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**