# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:19-cr-559 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| DEEPAK RAHEJA, *et al,*, | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

On September 18, 2019, plaintiff United States of America (the "government") caused an 83-count Indictment to issue charging four defendants, including Deepak Raheja ("Dr. Raheja" or "Raheja") and Frank Mazzucco ("Mazzucco"), with conspiracy to solicit, receive, offer, and/or pay health care kickbacks; receipt and/or offer to pay kickbacks in connection with a federal health care program; and other crimes associated with health care fraud. (Doc. No. 1 (Indictment).) Gregory Hayslette ("Hayslette") and Bhupinder Sawhny ("Dr. Sawhny" or "Sawhny"), the other two defendants charged in this case, entered guilty pleas to Count One of the Indictment, charging conspiracy under 18 U.S.C. § 371. (Minutes of Proceedings, 03/02/2022; Doc. No. 187 (Hayslette Plea Agreement); Minutes of Proceedings, 10/11/2022; Doc. No. 260 (Sawhny Plea Agreement).) The jury trial of Dr. Raheja and Mazzucco is set to begin on October 24, 2022.

On September 30, 2022, the Court conducted a final pretrial conference and motion in limine hearing. During the motion hearing, the Court announced its ruling on the record as to certain motions. Specifically, the Court advised on the record that Doc. No. 205 was GRANTED (subject to a possible witness voir dire at trial); Doc. Nos. 211, 212, 214, and 215 were DENIED;

and Doc. Nos. 204, 206, 207, 210, 216, and 218 were DENIED AS MOOT. The Court took the remaining motions under advisement and is now prepared to issue its rulings relative to Doc. Nos. 208, 209, and 217, as well as Doc. No. 219 (Government's Notice of Intent to Offer Patient Harm Evidence).)[1]

## I. BACKGROUND

For purposes of framing the present motions, it is sufficient to note that Avanir Pharmaceuticals, Inc. ("Avanir") developed and manufactured Nuedexta, a medication approved by the Food and Drug Administration ("FDA") solely for the treatment of Pseudo Bulbar Affect ("PBA"). PBA is a neurological condition characterized by involuntary, sudden, and frequent episodes of uncontrollable laughing and crying. Nuedexta is contraindicated for patients with certain medical conditions, including heart rhythm disorders.

Hayslette was employed by Avanir as a pharmaceutical sales representative and was responsible for the marketing of Nuedexta. Mazzucco was his supervisor. Hayslette and others promoted Nuedexta through a speaker program designed to encourage medical providers to prescribe Nuedexta for their patients. Drs. Raheja and Sawhny are medical doctors. Dr. Raheja specializes in psychiatry and neurology, and Dr. Sawhny is a neurosurgeon. It is alleged that Dr. Raheja received speaker fees and other things of value for symposiums that either never took place or had no educational value, and that both Drs. Raheja and Sawhny received kickbacks for prescribing Nuedexta to patients who were falsely diagnosed with PBA or for whom the drug was not indicated or even contraindicated.

---

[1] Because Dr. Sawhny has entered a change of plea in this matter, his motion to exclude patient emotional/physical harm evidence (Doc. No. 213) is DENIED AS MOOT.

## II. STANDARD OF REVIEW

Although not explicitly authorized by the Federal Rules of Evidence or the Federal Rules of Criminal Procedure, the practice of ruling on motions in limine "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984). Motions in limine allow the court to rule on evidentiary issues prior to trial in order to avoid delay and to allow the parties to focus remaining preparation time on issues that will in fact be considered by the jury. *See United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999); *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). In limine rulings are preliminary, and the district court may change its ruling at trial for any reason it deems appropriate. *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994).

## III. DISCUSSION

### A. Patient Harm Evidence (Doc. No. 219)

The government informed defendants it intends to offer evidence of two types of patient harm as *res gestae* or Fed. R. Evid. 404(b) evidence: direct harm—side effects of Nuedexta and adverse medication interactions—experienced by the patients; and indirect harm—lack of effective medical treatment for patients who received no benefit from being on the drug because it was not legitimately/properly prescribed. (Doc. No. 219 (Government's Intent to Offer Rule 404(b) Evidence).) The government maintains that this evidence is relevant in that it helps establish that Dr. Raheja, in prescribing Nuedexta, was motivated by the receipt of kickbacks, rather than by providing competent medical care to his patients. Such evidence, the government contends, is particularly relevant in this case because the evidence will show that Dr. Raheja continued to

prescribe Nuedexta after being told by patients that the drug was not helping or was actually causing ill effects. (Doc. No. 219 at 5.[2])

Defendants object to the government's notice of intent relative to patient harm evidence. (*See* Doc. Nos. 225 and 228).). Defendants argue generally that any emotional or physical harm suffered by patients from being prescribed Nuedexta has no bearing on the charged offenses and, therefore, amounts to impermissible Rule 404(b) "other acts" evidence. Moreover, at the motion hearing, defense counsel argued that any such evidence would either constitute incompetent expert testimony or could not be admitted unless it was accompanied by competent expert testimony on the subject of medical necessity.

The Court begins with the question of relevance. All relevant evidence is admissible and evidence that is not relevant is not admissible. Fed. R. Evid. 402. Evidence is "relevant" if it "has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R Evid. 401. The relevance standard is liberal. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 587, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). However, relevant evidence may be excluded if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

In support of its relevance argument, the government cites the First Circuit's decision in *United States v. Simon*, 12 F.4th 1 (1st Cir. 2021). There, executives of a pharmaceutical company

---

[2] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

were convicted of RICO conspiracy stemming from their promotion/marketing of a highly addictive sublingual fentanyl spray. On appeal, the First Circuit found that patient harm evidence was relevant to whether the prescriptions were legally prescribed. In particular, the court found that such evidence was "plainly relevant to show that the doctors' treatment was outside the course of professional practice. This [was] particularly true where, as here, each doctor continued to prescribe [the drug] to his or her patient despite knowing of the patient's addiction." *Simon*, 12 F.4th at 40.

Defendants reject *Simon* as a basis to inform this Court's decision, noting that *Simon* was a RICO case with violations of the Controlled Substance Act ("CSA") serving as certain predicate acts. *See id*. ("To prove the CSA predicates, the government had to show that the defendants agreed that a health care practitioner would prescribe [the drug] outside the usual course of medical practice and without any legitimate medical purpose."). But in their briefing and at the motion hearing, defense counsel did not deny that the issue of medical necessity has a bearing on this case as to whether Dr. Raheja was motivated by receiving kickbacks or by providing legitimate medical care when he prescribed Nuedexta. (*See, e.g*., Doc. No. 222 at 1 [noting that Dr. Raheja's "reasons for prescribing Nuedexta . . . [are] relevant and admissible as motive evidence in this trial"]; *see also id*. at 4 ["As the Government repeatedly posits in its Notice of Intent to Introduce Certain Evidence Under [Fed. R. Evid.] 404(b), Dr. Raheja's motivation for prescribing Nuedexta is an issue in this case."].) This is particularly true here, where the government maintains that Dr. Raheja "continued to prescribe [Nuedexta] to his[] patient despite knowing" that it was not benefitting and/or was harming his patient. *See Simon*, 12 F.4th at 40.

Further, the case law relied upon by defendants does not suggest a contrary conclusion. For

example, defendants rely on a ruling from another jurist in this judicial district in *United States v. Rakhit*, 1:18-cr-33, 2021 WL 3375946 (N.D. Ohio Aug. 2, 2021). But there, the judge found that evidence of patient harm *was probative* of whether defendants improperly wrote patient prescriptions without a legitimate medical purpose, but she excluded the evidence under Rule 403. Like the other cases relied on by defendants, the judge in *Rakhit* was addressing substantive § 841 controlled substances counts, not conspiracy counts, and the patient harm evidence involved other patients not charged in those counts. Given that each § 841 count charged a discrete event involving one particular patient, the judge found that evidence of other patients and the harm they allegedly suffered would impermissibly bolster the charged events by demonstrating a pattern that was not charged but could emerge from the evidence. *Id*. at *2.

Similarly, in *United States v. Kostenko*, No. 5:16-cr-221, 2017 WL 1395500 (S.D. W.Va. Apr. 17, 2017), another case cited by defendants, a physician was charged with seventeen counts of distributing oxycodone not for legitimate medical purposes, in violation of 21 U.S.C. § 841. In two of those charges, it was alleged that the patient died. While the court ruled that evidence of the overdose deaths of other patients was "potentially relevant to the requirement that the jury find that the distribution was 'not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice[,]'" it ruled that "[e]vidence regarding other, uncharged overdose deaths has the potential to be both unfairly prejudicial and confusing to the jury." *Id*. at *2. Because the present case does not involve discrete § 841 counts, there is no concern that evidence of patient harm would unfairly suggest a pattern that was not charged or otherwise unfairly weight individual counts that were charged.

Defendants also rely on cases wherein courts have ruled that evidence about "collateral

6

medical consequences" was not admissible in trials involving financial crimes. *See United States v. Cooper*, 286 F. Supp. 2d 1283, 1296 (D. Kan. 2003), For example, in *Cooper*, defendants were accused of fraudulently billing Medicare for unnecessary power wheelchairs and accessories. The district court refused to admit evidence of subsequent emotional or physical harm to the customers, suggesting the fact that customers may have suffered collateral medical consequences after the fraud was complete was "not relevant in proving the alleged financial motive and intent to defraud." *Id*. at 1296 (While the "medical consequences to [the customers] from the alleged fraudulent activities may be part of the whole story, . . . this evidence *does not tend to prove the existence of the financial motive* behind the intent to defraud that is alleged in this case.") (emphasis added); *see U.S. ex rel. El-Amin v. George Wash. Univ.*, 533 F. Supp. 2d 12, 33 (D.D.C. 2008) ("Evidence that a patient was harmed (or died) while receiving anesthesia services at the Defendant's hospital is not probative of whether the Defendant unlawfully billed Medicare for anesthesia procedures its anesthesiologists *did not perform*.") (emphasis added).

Unlike the cases cited by defendants where any harm to the patients was "secondary" to the charged financial fraud, *see El-Amin*, 533 F. Supp. 2d at 33 (noting that "whether a patient was harmed during [the] procedure was *secondary* to the anesthesiologist's failure to perform the service") (emphasis in the original, record cite omitted), the proposed patient harm evidence here tends to prove motive. That these patients may have suffered ill effects from being treated with Nuedexta makes it more likely that the drug was not prescribed for a medically appropriate reason, but instead, was prescribed with the intent to receive illegal kickbacks. The evidence is clearly relevant as to Dr. Raheja's motive.

Defendant Mazzucco argues that, even if the Court finds that patient harm evidence is

admissible as to Dr. Raheja, it has no bearing on his alleged involvement in the conspiracy as there is no evidence that he had any knowledge of or participation in the prescribing and billing activities of his doctor co-conspirators. Therefore, he insists that patient harm evidence cannot come in as to him, even if it comes in as to Dr. Raheja. (Doc. No. 228 at 2–3.) The court in *Simon* rejected a similar argument by pharmaceutical representative defendants, explaining:

> "At the risk of carting coal to Newcastle, we add that the patient-harm testimony also helped to explain how the defendants could expect doctors to fulfill their commitments to [the pharmaceutical] representatives, that is, to meet quotas obligating them to prescribe inordinately high amounts of [the drug in question]."

*Simon*, 12 F.4th at 41. While defendants have argued that this is not a quota case, the government represents that there are text messages involving discussions between Mazzucco and Hayslette and the doctors regarding the number of prescriptions they need to reach certain bonus goals. That Mazzucco may have pushed for these goals to be reached suggests that he understood that the doctors may have to sacrifice patient care to reach them; as such, it sheds light on his knowledge of and acquiescence in the scheme.[3] The Court finds that evidence that patients had negative experiences on Nuedexta is highly relevant as to both Dr. Raheja and Mazzucco.

Citing no authority, defense counsel also maintained at the motion hearing that—even if relevant—lay testimony regarding patient harm cannot be admitted unless it is accompanied by expert testimony. Specifically, defense counsel argued that allowing patients to testify as to their own experiences on Nuedexta, without also offering expert testimony on the subject of medical necessity, invites the jury to convict defendants for the prescription of medication that was simply

---

[3] Because this evidence would be admissible against Mazzucco in a separate trial were he tried without Dr. Raheja, the Court denies Mazzucco's renewed motion for a severance for the reasons previously set forth in its decision on the parties' pre-trial motions. (*See* Doc. 177 at 19–23.)

8

not effective in treating a patient's medical condition(s). But the Court is unaware of any "federal criminal law [that] requires expert testimony to support a conviction." *See United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017). Even on the subject of medical necessity, courts have refused to find a "basis for a categorical rule that expert testimony is required for a jury finding of medical necessity." *United States v. Martinez*, 921 F.3d 452, 474 (5th Cir. 2019) (quoting *Sanjar*, 876 F.3d at 745).

The inherent flaw in defendants' argument lies in their attempt to conflate the concepts of sufficiency and admissibility. "The issue of admissibility of evidence is simply different from the question whether properly admitted evidence is sufficient to convict the defendant." *Carmell v. Texas*, 529 U.S. 513, 546, 120 S. Ct. 1620, 146 L. Ed. 2d 577 (2000) (noting that evidence admissibility rules "do not go to the general issue of guilt, nor to whether a conviction, as a matter of law, may be sustained"). As Fifth Circuit recognized:

> The government's failure to call an expert may influence [the jury's] weighing [of the evidence] and is subject to attack during cross examination and closing argument. Indeed, in some cases it may even doom its case if the jury wants that expertise.

*Sanjar*, 876 F.3d at 745. However, it does not, the court found, impact the admissibility of such lay testimony. *Id*. While the court noted that there may be some medical conditions for which expert testimony may be needed *to support a conviction* on health care fraud, it ultimately concluded that the district court did not err in allowing patients to offer lay testimony regarding their own perceptions of their medical conditions without the existence of expert testimony on medical necessity. *Id*. at 746.

The fact remains that a patient's non-expert testimony regarding his own symptoms and experiences is admissible. In fact, a lay witness may even testify in the form of an opinion so long

9

as such testimony is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. In distinguishing lay testimony from expert testimony, the Sixth Circuit has explained, "lay testimony results from a process of reasoning familiar in everyday life, whereas an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007) (quotation marks and citation omitted). Courts often "favor[] the admission of opinion testimony, provided it is well founded on personal knowledge and susceptible to specific cross-examination." *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 240 (6th Cir. 2010) (quoting *United States v. Valdez-Reyes*, 165 F. App'x 387, 392 (6th Cir. 2006)); *see United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015) ("The function of lay opinion testimony is to 'describ[e] something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'") (quoting *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013)).

Patients may properly offer testimony about the symptoms they experienced because they are based on their own personal knowledge and susceptible to specific cross-examination. *See Kovacic v. Ponstingle*, No. 1:05-cv-2746, 2014 WL 4715859, at *2 (N.D. Ohio Sept. 22, 2014). Even in medical malpractice and civil rights actions where expert testimony may be required on the subject of causation, plaintiffs are permitted to testify as to their own symptoms. *See, e.g., McDonald v. City of Memphis*, No. 2:12-cv-2511, 2016 WL 8201168, at *5 (N.D. Ohio Sept. 22, 2014) (granting motion in limine as to lay opinion testimony on diagnosis requiring medical

10

opinion, but denying motion on plaintiffs' "testimony regarding their personal observations about their emotional and mental health, as well as any obvious physical conditions that were clearly caused by" defendants' actions).

Here, the government represents that it will not be asking these witnesses whether Nuedexta was medically necessary, nor will they be asked to offer a medical diagnosis or opine on the issue causation. Instead, these witnesses will be offering testimony on their personal observations about the symptoms they experienced while on the medication. While this evidence alone may ultimately prove insufficient to support a conviction for health care fraud—and defendants are free to make this point in closing arguments and/or in a Rule 29 motion—the evidence is admissible under the Federal Rules of Evidence.

Further, the Court finds that the proposed patient harm evidence is proper *res gestae* evidence that does not invoke Fed. R. Evid. 404(b). Any negative symptom patients may have experienced as a result of being prescribed Nuedexta both completes the story and is "inextricably intertwined" with the charged crimes themselves as it is directly probative of the question of motive to commit the charged offenses. *See United States v. Everett*, 270 F.3d 986, 992 (6th Cir. 2001); *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000).

The Court rules that the government may offer patient harm evidence.

### B. Patients not Named in the Indictment (Doc. No. 209)

The Indictment specifically identifies six of Dr. Raheja's patients as beneficiaries in the alleged fraudulent schemes, as well as three undercover special agents. Dr. Raheja now moves to preclude any reference/evidence relating to other patients not identified in the Indictment, underscoring the fact that the Indictment does not allege any patients were medically harmed by

taking Nuedexta. He argues that evidence of other patients would not make the charges relating to the identified patients any more or less probable. (Doc. No. 209 at 1, 3.) He further suggests that reference to other uncharged patients would be confusing and unfairly prejudicial based on a "risk of conviction based on 'association' in cases with many related charges." (*Id*. at 4 (quoting *Kostenko*, 2017 WL 1395500, at *2).) In addition to citing *Kostenko,* Dr. Raheja returns the judge's rulings in *Rakhit,* wherein she excluded patient harm evidence of patients not identified in the indictment because "the potential for unfair prejudice and confusion exists because such evidence would create a risk of convictions based on association, i.e., the jury would see a pattern of behavior and convict for individual counts that were not properly proved." (*Id*. at 5 (quoting *Rakhit*, 2021 WL 3375946, at *2).)

The government counters that it is permissible to offer evidence regarding other patients because this is a conspiracy case and it was not required to charge all acts in furtherance of the conspiracy. *See United States v. Bajoghli*, 785 F.3d 957, 963 (4th Cir. 2015). In *Bajoghli*, the court noted that evidence of transactions and conduct not charged was relevant to proving the existence and boundaries of the health care fraud scheme. *Id.* Further, the government argues that the case authority relied upon by Dr. Raheja, including the *Rakhit* case, is distinguishable on this ground. All of the cases relied on by Dr. Raheja addressed non-conspiracy discrete prescription charges (21 U.S.C. § 841), with each individual prescription charge involving a separate prescription. *See, e.g., Kostenko*, 2017 WL 1395500, at *2 (charging seventeen discrete counts of distributing oxycodone not for legitimate purposes). In those cases, there was a real potential for prejudice based on the jury seeing a "pattern" emerging based on uncharged acts, especially uncharged acts resulting in death to the patient, rather than viewing each charged count and its supporting evidence

independently.

The Court agrees that the cases relied upon by Dr. Raheja are easily distinguished by the fact that those cases were confined to an analysis of illegal prescribing charges pursuant to § 841, which the government notes are neither conspiracies nor scheme-based crimes. Indeed, the judge in *Rakhit* made that distinction herself when she explained that evidence of uncharged patient prescriptions would be "intrinsic" to the conspiracy charge but "extrinsic" to the § 841 prescription charges. (*See* Doc. No. 241 (*United States v. Rakhit*, N.D. Ohio 1:18-cr-33, Doc. No. 203 at 4).) Here, under Rules 401 and 402, evidence of transactions of other patients not specifically identified in the Indictment would be both relevant and admissible as acts in furtherance of the conspiracies and additional executions of the schemes charged. As for prejudice, the government represents that the evidence of "other patients" would be limited to identifying a limited number of patients by initials and other evidence showing the billing to the insurance company for unnecessary or unperformed procedures. The prejudice from such evidence in a conspiracy case, especially where of the evidence sought to be used does not involve death or serious injury, would be much less prejudicial than extrinsic evidence of other deaths in a case involving discreet prescription charges.

Dr. Raheja's motion to preclude reference to or testimony from patients not identified in the Indictment (Doc. No. 209) is DENIED.

### C. Prior Good Acts (Doc. No. 217)

The government moves to preclude Dr. Raheja from offering what it has termed "prior good acts" evidence in the form of patient testimony that they were happy with the doctors' treatment with Nuedexta and is the corollary to the motions and notice addressing patient harm evidence. (Doc. No. 217.) The government suggests that this is classic reverse Rule 404(b)

13

evidence that is not permitted to show that Dr. Raheja has a predisposition not to commit crimes.

In his opposition brief, Dr. Raheja advises that he intends to call former patients to testify to "Dr. Raheja's reasons for prescribing Nuedexta, which is relevant and admissible as motive evidence in this trial." (Doc. No. 222 at 1.) Dr. Raheja makes the point that the government has admitted that his motivation for prescribing Nuedexta is relevant and, if the government is allowed to offer evidence as to motive, he argues he should be too.

During the motion hearing, counsel for the government confirmed that it would only present testimony from patients who were prescribed Nuedexta to treat PBA and did not, in fact, have PBA. Further, the government made clear that it was not going to take the position that every prescription written by Dr. Raheja for Nuedexta was unlawfully motivated by the prospect of illegal kickbacks. Given these parameters, it was the Court's understanding that all counsel agreed that it would be inappropriate to offer testimony from other patients who had PBA and for whom Nuedexta was properly prescribed. In an abundance of caution, however, the Court writes on this subject so that there are no misunderstandings as what the Court believes the parties agreed to and to the Court's position on this evidence at trial.

Evidence that an individual acted lawfully on other occasions not charged in the indictment is generally inadmissible in that it does not negate the charge that he acted with criminal intent on another occasion. *See United Sates v. Daulton*, 266 F. App'x 381, 386–87 (6th Cir. 2008) (evidence that defendant prepared non-fraudulent tax returns in years not charged in the indictment was impermissible reverse Rule 404(b) "good acts" evidence); *United States v. Dobbs*, 506 F.2d 445, 447 (5th Cir. 1975) ("evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant"); *see, e.g., United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008)

(In fraud trial involving bogus entertainment event, evidence that defendant had produced a prior legitimate event was not relevant to "negate criminal intent"). It may be probative, however, where a defendant is alleged to have "always" or "continuously" committed the acts alleged. *United States v. Damti*, 109 F. App'x 454, 455–56 (2d Cir. 2004); s*ee also Daulton*, 266 F. App'x at 386 ("Evidence of noncriminal activities 'would only be relevant if the indictment charged the defendants with ceaseless criminal conduct.'") (quoting *United States v. Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990)); *Dobbs*, 506 F.2d at 447 (finding reverse 404(b) evidence not relevant where the defendant was not charged with a scheme).

The Court has addressed this issue in two prior cases. In *United States v. Dimora*, defendant Dimora was not allowed to offer evidence that on other occasions he did not accept bribes in exchange for official acts because he was not charged with an unceasing conspiracy. *Dimora*, 843 F. Supp. 2d 799, 837–39 (N.D. Ohio 2012). In *United States v. Hills*, defendant-dentists tried to offer evidence of other referrals—wherein patients were referred back to MetroHealth later—to show that there was a legitimate, non-corrupt reason for the referrals. The Court concluded that defendants' effort to show a pattern of referrals back and forth between MetroHealth and the private clinics was still impermissible propensity evidence. *Hills*, No. 1:16-cr-329, 2018 WL 3120637, at *4–5 (N.D. Ohio June 24, 2018); *see Daulton*, 266 F. App'x at 386 ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."); *see United States v. Miller*, 673 F.3d 688, 699 (7th Cir. 2012) ("pattern evidence *is* propensity evidence") (emphasis in original).

Recently, the Eleventh Circuit had cause to address this type of evidence in a health care fraud case. In *United States v. Ifediba*, a physician who operated a clinic was indicted along with

15

his clinical nurse in a conspiracy to commit health care fraud by, in part, prescribing large quantities of opioids to patients who had no medical need for them. *Ifediba*, 46 F.4th 1225, 1230 (11th Cir. 2022). On appeal, the defendant-physician challenged the district court's exclusion of evidence showing that he provided legitimate medical treatment to some patients. At trial, the district court determined that this was merely an attempt to portray the defendant-physician as a person of good character by pointing to some of his good acts. *Id*. at 1238.

The Eleventh Circuit ruled that the district court "did not abuse its discretion when it excluded the good-care evidence as inadmissible character evidence." *Id*. In reaching this conclusion, the court of appeals noted that the government "never alleged that [the defendant-physician] unlawfully treated every patient who walked through [his clinic's] doors; indeed, it conceded that his treatment of some patients was legitimate." *Id*. "Thus, [the court concluded that] it was no defense that [the physician] lawfully treated some patients." *Id*.

Similarly, here, the government does not maintain that Dr. Raheja unlawfully treated all of his patients for whom he prescribed Nuedexta. To the extent Dr. Raheja wishes to offer evidence relating to his motivation in prescribing Nuedexta for the patients at issue in the charged conspiracies, the evidence is admissible. But to the extent that he wishes to offer evidence that on other occasions he lawfully prescribed Nuedexta for his patients who suffered from PBA, the evidence represents inadmissible character evidence that is prohibited by Rule 404(b). With that clarification, the government's motion to exclude prior good acts (Doc. No. 217) is GRANTED.

### D.  Unnamed MetroHealth Doctor (Doc. No. 208)

In April 2017, the FBI conducted an interview with one of Dr. Raheja's former patients, D.L., who advised that an unnamed doctor at MetroHealth discontinued the patient's prescription

for Nuedexta that Dr. Raheja had prescribed. Dr. Raheja now seeks to exclude as hearsay any statements made by the doctor to the patient regarding his reasons for discontinuing the medication. In support, he underscores that the doctor's statements cannot be tested on cross-examination and suggests that admission of any such statements would violate his Sixth Amendment rights. (Doc. No. 208 at 4–6.)

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). But "the hearsay rule bans in-court repetition of extrajudicial utterances only when they are offered to prove the truth or falsity of their contents." *United States v. Gibson*, 675 F.2d 825, 833 (6th Cir. 1982) (citations omitted). The rule does not apply to statements offered merely to show that they were made or had some effect on the hearer. *United States v. Martin*, 897 F.2d 1368, 1371 (6th Cir. 1990) (citing *United States v. Gibson*, 675 F.2d 825, 833–34 (6th Cir. 1982)). The government argues that any statement by the unnamed doctor that the patient did not have symptoms of PBA—the reason for discontinuing the medication—"is admissible to describe the effect it had on D.L." (Doc. No. 233 at 1.) *See Wright v. Beard*, No. 1:14-cv-90, 2016 WL 7173787, at *2 (W.D. Ky. Dec. 8, 2016) (The hearsay rule "does not apply to statements offered merely to show that they were made or had some effect on the hearer.") (citing, among authority, *Martin*, 897 F.2d at 1371). Here, the effect would be that the hearer/patient stopped taking Nuedexta. If offered for this reason, the doctor's statements would not constitute hearsay. Alternatively, at the hearing, the government argued that it should at least be allowed to ask whether D.L. was prescribed Nuedexta/continued to take Nuedexta after he stopped seeing Dr. Raheja and started treating with a new doctor. (Doc. No. 233 at 2.)

Dr. Raheja does not take issue with the general principle that statements offered merely to

show the effect on the listener fall outside the hearsay rule. Instead, he maintains that the government is impermissibly trying use D.L. to introduce through the backdoor an expert opinion that there was no medical necessity for prescribing Nuedexta to D.L. in the first instance. At the motion hearing, his counsel argued that there can be no other purpose for offering such testimony than to bring in the medical opinion of an unnamed doctor that D.L. did not have PBA and was inappropriately prescribed Nuedexta by Dr. Raheja for nefarious reasons. Counsel for Dr. Raheja, however, indicated that he would not object to the government's alternative line of questioning regarding whether D.L. was prescribed Nuedexta/continued to take Nuedexta after he stopped seeing Dr. Raheja. (Indeed, he cannot properly object as the alternative line of questioning does not involve another's statement.)

Given the government's stated reason for pursuing this line of questioning (to show that D.L. stopped taking Nuedexta after he ceased treating with Dr. Raheja), and given the inherent danger of allowing a patient to convey the medical opinion of an unnamed doctor who is not subject to cross-examination, the Court will not permit the government to explore what the unnamed MetroHealth doctor told D.L. about his condition or the reasons why he was taking him off Nuedexta. The government will, however, be permitted to inquire as to whether D.L. continued to treat with Nuedexta after he was seen by the MetroHealth doctor. Dr. Raheja's motion to preclude mention of and statements made by an unnamed MetroHealth physician (Doc. No. 208) is GRANTED IN PART and DENIED IN PART.

## IV. CONCLUSION

For the foregoing reasons, Doc. No. 217 is GRANTED, Doc. No. 209 is DENIED, and Doc. No. 208 is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED**.

Dated: October 12, 2022

**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**